**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **Crim. No. 2:23-CR-454** |
| | : | **Crim. No. 2:24-CR-253** |
| **RAKIEM SAVAGE** | : | |
| | : | |

**DEFENSE SENTENCING MEMORANDUM FOR RAKIEM SAVAGE**

Rakiem Savage, through his counsel Lawrence J. Bozzelli, respectfully submits the following Defense Sentencing Memorandum in the above cited case and is requesting a downward variance from the calculated sentencing Guidelines.

In summary, Rakiem Savage would ask that your Honor impose a sentence of 72 months in addition to a 3-year period of Supervised Release to be concurrent on both cases. The Guideline range has been calculated by U.S. Probation to be 87 – 108 months based upon a 27/ III range.

The defense would argue that a sentence of 72 months of imprisonment is sufficient, but not greater than necessary to achieve the goals of sentencing. As explained in greater detail below, Savage has suffered through (1) a childhood marked by a father's incarceration and a violent neighborhood, (2) the steadying presence of a grandmother and mother who never gave up on him, (3) three near-fatal shootings that would leave lasting trauma on any person, (4) demonstrated employment history, and (5) consistent, verifiable steps toward

rehabilitation and treatment, all paint a picture of a young man whose history and characteristics justify a sentence meaningfully below the advisory guideline range. Lastly, the defense argues that the Criminal History category, while accurate, overstates his criminal history based upon the charges [DUI] and the sentences imposed.

## I. INTRODUCTION

On October 18, 2023, a grand jury in the Eastern District of Pennsylvania returned a seven-count Indictment against Rakeim Savage, Ronald Byrd, Haneef Palmer, and Malik Palmer in which they were accused of several charges including robbery which interferes with interstate commerce and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) and 2.

On July 10, 2024, a grand jury sitting in the Eastern District of Pennsylvania returned a nine-count Indictment against Jahlil Williams, Rakeim Savage, Kyair Garnett, Haneef Roberson, Biheis Moore, Rakeim King, Ward Roberts, and Harry Draper. Count 1 charged conspiracy to participate in the affairs of a racketeering enterprise (RICO), in violation of 18 U.S.C § 1962(d).

On March 30, 2026, the defendant appeared before your Honor and pled guilty to the one-count Indictment, pursuant to a written plea agreement.

## II. DEFENDANT'S BACKGROUND AND LIFE CIRCUMSTANCES

### Personal Life

The history and background of Rakeim Savage, as described in the Presentence Investigation Report (PSR ¶¶ 192–222), strongly support a sentence below the advisory

guideline range. Mr. Savage grew up facing childhood instability, the absence of his father, and a violent environment that left him with life-threatening injuries three times. Despite these hardships, his devoted family has always stood by him. These facts do not excuse his actions, but they provide important context for the Court to consider under § 3553(a)(1) and show that Mr. Savage is much more than his conviction.

- Childhood Instability and Absence of a Father Figure

Rakiem Savage was born on May 19, 1998, in Philadelphia, the only child of Shakera Clark and Rakeim Savage, who were never married. (PSR ¶ 192.) His father was, in Mr. Savage's own words, "**locked up for most of my life**," and because of his mother's young age at the time of his birth, Mr. Savage was primarily raised by his paternal grandparents, Toni Isley and the late Charles Harrington. (PSR ¶¶ 192, 194.) He was raised in the Strawberry Mansion section of North Philadelphia, a neighborhood he described as "afflicted with drugs and violence," where he regularly heard gunshots and witnessed drug activity as a child. (PSR ¶ 194.) His grandfather, who supported the family through decades of employment with SEPTA, died of a heart attack when Mr. Savage was just sixteen years old which amounted to a formative loss at a critical developmental age. (PSR ¶ 194.)

Despite these circumstances, his mother remained an involved and committed parent throughout his childhood, and he moved in with her at age fifteen, first in Frankford and later in Northeast and South Philadelphia. (PSR ¶ 195.) That his mother has now been reunited with him at every step, and has already confirmed to Probation that he is welcome to live with her upon release, reflects the strength of that bond even through years of

hardship. (PSR ¶¶ 195, 197, 199.)

## III. SPECIFIC OFFENSE CONDUCT

The defense would point out that the 2 underlying crimes that Savage plead guilty to committing as part of the RICO conspiracy (Conspiracy to Commit counterfeiting and Conspiracy to Commit Mail and Wire Fraud via a PUA loan). This underlying offense conduct is a distinction from the broader actions of other co-defendants in this conspiracy which include drug trafficking and homicide. As outlined in factual basis of his change of plea hearing, Savage's conduct involved a conspiracy to pass counterfeit currency and submitting a fraudulent application for a Pandemic Unemployment Assistance funds which resulted in the loss of $37,425.

Savage has also plead guilty to theft from interstate shipments. It should be noted that the time frame of this conduct [January 2023 – July 2023] overlaps with the RICO activity [August 2018 – August 2023]. The defense would argue that this is a continuing source of conduct and it is for this reason that both parties have agreed to jointly recommend that any sentence imposed on docket 2:23-CR-454 and 2:24-CR-253 be ordered to run concurrently.

- Savage has a Devoted and Extensive Family Support System

The record reflects a family that has rallied around Mr. Savage rather than abandoned him. His mother, Shakera Clark, described him to Probation as "a very good kid" who

"attended school and earned good grades," and "a happy person . . . a good family person." (PSR ¶ 197.) She emphasized that "everybody shows up for him" and that "he has a big support system," noting in particular his close bond with his paternal grandmother: "He does everything for her. . . . That's his world and he is hers." (PSR ¶ 197.)

His aunt, Yvette Savage, echoed this when Probation contacted her, stating that her immediate reaction upon learning of the charges was that "that wasn't him, that's not something he would get involved in," and describing him as "a young man with a head on his shoulders" who is "very family oriented" and "helpful," someone who "helps out elderly people" and is not "one of those thug-like kids out there robbing and shooting people." (PSR ¶ 198.)

Mr. Savage also has close, positive relationships with his half-siblings, including his twin half-brothers Yahmir and Zahmir, who are both autistic. His brother Zahmir requiring full-time residential care and his younger half-sister, J-Lynn. (PSR ¶ 193.) His mother reported that Yahmir misses him and "looks up to him," and Mr. Savage himself expressed genuine remorse about "setting a bad example being in [prison]" for his siblings. (PSR ¶¶ 193, 197.) A home visit conducted by Probation on May 19, 2026, confirmed that his mother's residence at 8001 Mars Place, which is a stable, adequately sized row home with no firearms and no pets, is a suitable, verified release plan. (PSR ¶ 199.)

- <u>Savage has A History of Being the Victim of Severe Gun Violence</u>

Among the most significant mitigating facts in this case is that Mr. Savage has himself been the victim of catastrophic gun violence on three separate occasions, none of which

resulted in any arrest or prosecution of the individuals responsible. (PSR ¶¶ 204–206.) In 2017, he was shot in the stomach and both legs in what he described as a case of "wrong place, wrong time" in which he was not the intended target; he underwent stomach surgery at Penn Presbyterian Medical Center and was hospitalized for approximately a week. (PSR ¶ 204.) On September 20, 2018, he was shot multiple times in a drive-by shooting in North Philadelphia, sustaining wounds to both thighs and his right foot and heel, requiring hospitalization at Einstein Medical Center. (PSR ¶ 205.)

Most severely, on April 1, 2019, Mr. Savage was riding in a car that came under gunfire in North Philadelphia. He was rushed to Temple University Hospital, where the trauma team performed emergency surgery on his neck, including a left neck exploration, tracheostomy, and removal of a bullet fragment from his throat and on his knee. (PSR ¶ 206.) His documented injuries from that shooting alone included a fractured neck, a punctured thyroid gland, a lacerated vocal cord, fractures of his clavicle, scapula, and tibia, and acute post-hemorrhagic anemia. (PSR ¶ 206.) He was hospitalized for over a week and required months of subsequent physical therapy. (PSR ¶ 206.) He bears permanent, visible scarring from these events. (PSR ¶ 203.)

A man who has been shot on three separate occasions, nearly losing his life at age twenty, has lived his entire adult life against a backdrop of trauma and loss that this Court should weigh heavily in fashioning a sentence sufficient, but not greater than necessary, to satisfy the purposes of § 3553(a).

- <u>Physical and Mental Health</u>

Rakiem Savage has never been diagnosed with or treated for a mental health condition and denies any history of suicidal ideation. (PSR ¶ 210.) He candidly acknowledged to Probation, however, that his current incarceration has affected his sleep and his mood, and that he "sometimes feels depressed about not having my freedom" — struggles he described as understandable given his circumstances and manageable through activities like basketball, exercise, and music. (PSR ¶ 210.) Physically, he continues to manage elevated blood pressure and childhood-onset asthma, and he has expressed a desire to improve his health through weight loss and continued physical activity. (PSR ¶ 208.)

- <u>Substance abuse</u>

Mr. Savage has been forthcoming about a history of marijuana use beginning at age fifteen and, later, use of codeine-based "syrup," both of which he candidly disclosed to Probation. (PSR ¶ 212.) Rather than minimizing this history, he has affirmatively sought treatment: he participated in weekly counseling sessions at the Greater Philadelphia Asian Social Services Center as a condition of his ARD program, and he has since requested placement in the Bureau of Prisons' Non-Residential Drug Abuse Program and expressed specific interest in participating in RDAP. (PSR ¶¶ 213–214.) This demonstrated willingness to engage in treatment, rather than resistance to it, is precisely the kind of characteristic that supports a sentence structured around rehabilitation and the provision of needed correctional treatment under § 3553(a)(2)(D).

- <u>Education, Work Ethic, and Constructive Use of Time</u>

Despite considerable disruption (transferring high schools multiple times, including one

closure mid-enrollment) Rakiem Savage graduated from Benjamin Franklin High School in 2016, where he also completed a vocational program in electrical work. (PSR ¶ 215.) While on pretrial supervision, he worked full time for Rackley and Son's Residential and Commercial Cleaning Services, earning $15 per hour and providing verified pay statements, demonstrating his ability to maintain steady, lawful employment when given the opportunity. (PSR ¶ 218.)

While in Federal custody, Mr. Savage has consistently sought out self-improvement and educational programming, completing more than a dozen BOP courses (including Mind Strength, Introduction to Stress Management, Cultural Anthropology, and multiple health-focused classes). See attached exhibits. Also, Savage has expressed clear, concrete goals for the future, including obtaining his commercial driver's license and pursuing training in welding and small-business ownership. (PSR ¶¶ 216–217, 219.) This record reflects a man actively preparing for a law-abiding, productive future rather than one resigned to further criminality.

- <u>Savage has a stable plan upon release</u>

Unlike many defendants facing sentencing, Mr. Savage's re-entry plan is not aspirational, it is verified. Probation has confirmed through a home visit that he has a stable, appropriate residence with his mother, that his foundational identification documents are secured, and that he remains registered with the Selective Service System. (PSR ¶¶ 199, 202.) This stability minimizes the risk of recidivism and supports a sentence that allows Mr. Savage to return to a proven support structure without unnecessary delay.

## IV. POST-*BOOKER* SENTENCING IN THE THIRD CIRCUIT

A district court commits procedural error when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence. ***United States v. Genao***, 869 F.3d 136, 140 (2d Cir. 2017).

After the Supreme Court's decision in ***United States v. Booker***, 543 U.S. 220, just as before it, a sentencing court must correctly calculate a defendant's guideline range and then consider whether there is any basis set forth in the Guidelines Manual to "depart" from the after considering all of the factors in 18 U.S.C. § 3553(a), a sentence outside of the applicable guideline range should be imposed as a "variance." See USSG §1B1.1, comment

Since the Guidelines became advisory, however, sentencing procedures have evolved to the point where courts routinely bypass the second step and address the defendant's mitigating or aggravating circumstances by reference to the § 3553(a) factors rather than under the policy-driven departures under the Guidelines. The 2025 Guidelines remove the second step to more accurately reflect the actual sentencing practices of federal courts. As such, all of the departure provisions and related policy statements have been deleted from the body of the Guidelines Manual and instead consolidated in Appendix B for historical reference, with the exception of U.S.S.G. § 5K1.1, which allows sentence reductions based on a defendant's assistance to the investigation, and U.S.S.G. § 5K3.1 (now 3F1.1), which

provide for reductions in cases involving early dispositions ("fast track" pleas) – both of these departures remain in effect.

## V. **THE PURPOSE OF SENTENCING**

The Courts have long understood that sentencing serves the purposes of retribution, deterrence, incapacitation, and rehabilitation. Deterrence, incapacitation, and rehabilitation are prospective and societal, each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community? ***United States v. Cole***, 622 F.Supp.2d 632 (N.D. Ohio 2008)

Federal sentencing law generally tracks these purposes. Section 3553 tells the Federal Courts to choose a sentence that reflects the seriousness of the offense (retribution), promotes respect for the law (retribution, general deterrence), provides just punishment for the offense (retribution), affords adequate deterrence to criminal conduct (general deterrence), protects the public from further crimes of the Defendant (specific deterrence, incapacitation), and provides the Defendant with needed training, care, and treatment (rehabilitation). 18 U.S.C. § 3553(a)(2).

### RETRIBUTION

One can say that "retribution" imposes punishment to reflect respect for the dignity of the victim. In other word, society stands with victims and exacts punishment in rough

approximation to the detriment caused by the defendant. Retribution is about "just deserts" and the sentence should be proportionate to the defendant's moral culpability.

As it relates to Rakeim Savage, the offense conduct at issue (theft from tractor-trailers while drivers were away from their vehicles, a counterfeiting conspiracy, and COVID-era loan fraud) involves financial and property loss, not violence against any person. Just punishment under § 3553(a)(2)(A) should be calibrated to the actual harm caused, which here is economic and largely recoverable through restitution, rather than treated as equivalent in moral culpability to offenses involving physical injury or the threat of it. A guideline sentence, combined with a substantial restitution obligation and the collateral consequences of a federal RICO conviction, already exacts a significant and proportionate measure of punishment without the need for a term at the high end of the range.

REHABILITATION

The "goal" of "rehabilitation" is the attempt to turn one person's path away from crime and towards being a productive, law-abiding citizen. § 3553(a)(2)(D) directs the court to consider the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." The purpose of rehabilitation is forward-looking and need-based. It asks what this defendant needs to be rehabilitated, not what a generic offender convicted of a generic offense requires. Where a defendant has already demonstrated, through years of conduct, that he doesn't need the structure of incarceration to desist from prior criminal patterns, a long sentence isn't advancing rehabilitation, rather it's simply incapacitation or retribution

wearing rehabilitation's label.

Courts are reminded that imprisonment is not an appropriate vehicle for promoting rehabilitation, and that rehabilitative needs are better served through targeted programming than through extended custody. Here, the defendant has already demonstrated a genuine commitment to self-improvement and has concrete, realistic plans (including vocational training and stable family support) that would allow him to reintegrate productively. A shorter term of incarceration coupled with a structured period of supervised release, financial-literacy conditions, and vocational programming better serves his rehabilitation than additional years in custody, which would only delay his ability to make restitution and rebuild a law-abiding life.

As it relates to Savage, he has begun his path to rehabilitation based upon his mental state and his willingness to accept that he cannot continue down this path. Savage expressed to the probation officer his willingness to get a trade once he is released from jail. Preparing to have a legal job once released from custody shows his ability to be rehabilitated.

## INCAPACITATION

Incapacitation under § 3553(a)(2)(C) asks one forward-looking question: how much future danger does *this defendant* pose to the public, such that removing him from society for a longer period reduces that danger? Because it is a prediction, it should be grounded in the best available evidence about this individual's risk of future violence, not in the worst-case profile the statute was designed to reach.

Cesare Beccaria Bonesana is often cited as the father of modern criminal law in *On Crimes and Punishments*, wherein he argued that the effectiveness of punishment is found in its certainty and promptness, not its severity. His work is a concise treatise that would become the crown jewel of the Italian Enlightenment and a classic text of modern penality. Bonesana's key argument was that excessively harsh sentences do not deter crime more effectively than moderate ones; instead, they harden the individual and make them more callous toward society.

The conduct of Mr. Savage involves theft and fraud schemes, not violence, and there is no indication the defendant poses a physical danger to any person. Any residual risk of further financial misconduct can be effectively managed through supervised release conditions — including restrictions on financial transactions, employment monitoring, and reporting requirements — that do not require years of continued imprisonment to accomplish the same protective goal.

## DETERRENCE

Deterrence has both a specific and a general function. Specific deterrence dissuades the particular defendant from engaging in criminal conduct. In contrast, general deterrence discourages others from engaging in similar criminal conduct.

Another problem with justifying punishment as a means to deter others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote deterrence of others. "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all

cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, *The Science of Right* 195 (1790).

As for the deterrence factor, this prosecution represents Rakeim Savage's first exposure to federal custody and the first time he has faced the full weight of the criminal justice system; that experience alone provides substantial deterrent force without requiring a lengthy term to drive the point home.

## VI. THE APPLICATION OF DEPARTURES AND VARIANCES

The Third Circuit specifically endorses the terminology of "departure" to refer to a sentence outside of the range that was contemplated by the guidelines system, and "variance" to refer to a sentence outside of the range that was imposed under the court's discretion pursuant to §3553(a). It asks that district courts and counsel employ this terminology as well. ***United States v. Jackson***, 467 F.3d 834, n.2 (3d Cir. 2006).

## VII. DOWNWARD DEPARTURE CONSIDERATIONS

The defense could not find any applicable downward departures that apply in this case apart from those afforded to the defendant's early guilty plea as outlined in USSG §3E1.1.

## VIII. IMPORTANT FACTORS TO CONSIDER PRIOR TO SENTENCING PURSUANT TO § 3553(a) / VARIANCES FROM THE SENTENCING GUIDELINES

**(1) <u>Treating similarly situated defendants equally</u>**

As it pertains to the RICO case (24-CR-253), the members of the conspiracy did not have defined roles. PSR ¶43. They all assumed various responsibilities throughout the duration of the conspiracy. Also, the statutory mandate of 18 USC §3553(a)(6) requires a District Court to "consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Thus, Savage would argue that a sentence received by one defendant may be a measurement of fair sentence for all.

- ***USA vs. Ward Roberts***, 60 months incarceration
  Conspiracy RICO [count 1]
  Conspiracy Counterfeiting [count 8]
  Conspiracy Mail and Wire Fraud [count 9]

- ***USA vs. Harry Draper***, 78 months (Draper had 29 Criminal Points)
  Conspiracy RICO [count 1]
  Conspiracy Counterfeiting [count 8]

- ***USA vs. Ronald Bell***, 18 months incarceration
  Possession of Counterfeit Currency

- ***USA vs. Germaine Lewis***, 66 months incarceration
  Robbery
  Conspiracy Counterfeiting

- ***USA vs. Justice Harris***, 60 months incarceration
  Robbery
  Conspiracy Counterfeiting

- ***USA vs. Tahir Rivers***, 38 months incarceration
  Robbery
  Conspiracy Counterfeiting

- ***USA v. Salahudin Reddy***, 94 months
  Conspiracy
  Theft from Interstate Shipping

- ***USA v. Baheis Moore***, 63 months
  Conspiracy RICO [count 1]
  Conspiracy Counterfeiting
  Wire Fraud

**(2) <u>The defendant's criminal history is overstated and unfairly effects is Guideline range</u>**

Savage receives 2-points in his criminal history score based upon a DUI conviction. On February 14, 2024, following the revocation of his ARD placement, Mr. Savage was sentenced in the Berks County Court of Common Pleas to a term of "72 hours to 6 months." (PSR ¶ 174.) The defense concedes that the inclusion of the 2-point offense for a 2020 DUI is accurate given that the maximum sentence imposed determines the points given to an offense. Applying that rule here, the 6-month maximum exceeds the 60-day threshold in § 4A1.1(b), so two criminal history points, rather than one point under § 4A1.1(c), are correctly assessed for this conviction.

Counsel raises no technical objection to the calculation itself. The point, rather, is that this mechanical rule produces a criminal history score that bears little relationship to what to the offense that Savage actually committed, and that disconnect is precisely the kind of circumstance the Sentencing Commission built §3553(a) factors to address.

Section 4A1.1(b)'s two-point tier is designed to distinguish defendants who served a meaningful period of custody, at least 60 days, from those who received only brief or no confinement. Mr. Savage was sentenced on February 14, 2024, and was paroled just 3 days later, on February 17, 2024. (PSR ¶ 174.) In substance, he served only the 72-hour statutory

minimum, not the theoretical 6-month maximum that drives the point calculation. The very state court that sentenced him plainly did not treat this as a case warranting extended incarceration. A guideline rule that assigns Mr. Savage the same two points as a defendant who actually served five or six months in custody substantially overstates the seriousness of what he did and the sentence he actually received for doing it.

This was Mr. Savage's first DUI. (PSR ¶ 174.) The Commonwealth's own prosecutors and the Berks County court initially resolved the case not through incarceration, but through the Accelerated Rehabilitative Disposition program, which is a diversionary track reserved for defendants assessed as good candidates for rehabilitation, with minimal risk to public safety. (PSR ¶ 174.) The underlying conduct, as described in the affidavit of probable cause, involved a single-vehicle traffic stop in a fast-food drive-thru line; there was no accident, no injury to any person, and no allegation of reckless or dangerous driving beyond the stop itself. (PSR ¶ 175.) That the case only resulted in a term of imprisonment after a later ARD revocation should not be permitted to recharacterize what was, and remains, a low-level, non-violent traffic offense into the equivalent of a several-months' custodial sentence for criminal history purposes.

Savage's total criminal history score is 4, placing him in Criminal History Category III. (PSR ¶¶ 176, 178.) Two of those four points (which amount to fully half) come from this single, non-violent DUI conviction for which Savage actually served 3 days in custody. Were this conviction assessed at 1 point rather than 2, consistent with the reality of what Rakiem Savage served, his total score would fall to 3, placing him in Criminal History Category II rather than Category III. A one-point swing driven entirely by a guideline fiction about a

stated statutory maximum, rather than any additional culpability, violence, or demonstrated risk to the community, is exactly the kind of over-representation that would allow your Honor to impose a lower sentence. If Savage were in this Criminal History range of II, then his calculated Guidelines would be **27/ II** for **78 – 97 months**.

Savage received 2 Criminal History Pints for a first-time DUI offense that the Commonwealth itself initially treated as appropriate for ARD diversion and rehabilitation, and for which Mr. Savage ultimately served only three days in custody. Counting that offense at full weight (i.e., the same weight given to defendants who serve months in custody) substantially overstates the seriousness of Savage's criminal history and his likelihood of reoffending. A downward variance under 18 U.S.C. § 3553(a), to a criminal history category that reflects Rakiem Savage's actual history rather than a guideline fiction, is warranted and appropriate.

**(3) The nature of the defendant's plea and his involvement in the RICO case**

The defense contends that there is a big disparity between what Savage plead guilty to in the written guilty plea and the facts as opposed to what is contained in the PSR and what may be argued by the prosecution. As your Honor may recall, the defense objected at the Change of Plea hearing to the inclusion of superfluous language that was in the prosecution's change of plea memorandum on case 24-CR-253. While certain members of the OMERTA gang engaged in a wide array of activities including murder and drug distribution, Savage plead guilty to his role in a conspiracy to pass counterfeit currency and wire fraud based

upon the distribution of exactly $37,425. PSR ¶ 92. The defense has filed objections to paragraphs 93-104 which talks about actions that Savage never agreed to having committed and to which defense counsel found no evidence such as "helping to smuggle contraband into prisons" or that Savage "helped OMERTA plan violent acts". The defense acknowledges that these allegations do not increase the Guideline range, but believes that it is unfair to include, and potentially attribute, conduct to Savage that he never agreed to as part of his plea. The defense contends that Savage's actions should be strictly limited to the conduct he admitted to at his change of plea hearing, not the overarching actions outlined in Count I (which cover over 31 pages).

As the Commentary to Section 6B1.4 states, such a stipulation "must fully and accurately disclose all factors relevant to a determination of sentence" and must not "present the court with an appearance of agreement in areas where agreement does not exist.... The stipulation should identify all areas of agreement, disagreement and uncertainty that may be relevant...." U.S.S.G. § 6B1.4 (Commentary); ***U.S. v. Telesco***, 962 F.2d 165 (2nd Cir. 1992)

"Section 6B1.4(d) makes clear that the court is not obliged to accept the stipulation of the parties." ... [and that] in determining the factual basis for the sentence, the court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information." § 6B1.4 (Commentary).

See USSG § 6B1.4(d) (stating that the court is not bound by stipulation of facts and sentencing range in plea agreement "but may, with the aid of the presentence report, determine the facts relevant to sentencing"); see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the [defendant's] background, character, and

conduct . . . which a court . . . may receive and consider for the purpose of imposing an appropriate sentence.").

**(4) <u>Savage has kept busy while in custody completing classes and being productive</u>**

Savage has completed an impressive number of courses while at the FDC. These courses include "Practicing Gratitude" and "Mind Strength". These course show that Savage is actively trying to better himself and leave the Federal prison system a new man. A copy of all of these certificates have been included as an attached exhibit.

**(5) <u>Savage has a large community of support</u>**

Savage has enjoyed strong support from his family which is evident from the several letters of support attached to this defense sentencing memorandum. Your Honor can see all the letters in their entirety, but here is a small sampling of the sentiments expressed in the letters:

- "**Since Rakiem has been incarcerated, I have seen him mature. I believe he understands life differently now and has had time to really think about his future, his responsibilities, and the kind of man he wants to be. I know that saying someone has changed is easy, but I genuinely see more maturity in him."**

  – Amera Fortune
- **"He is a genuinely caring young man who has consistently shown love and concern for the people around him. After experiencing the devastating loss of**

> **my own child, Rakiem has been one of the people who continues to check on me and make sure I am okay. Those moments mean more to me than I can fully put into words."** – Tahire Fortune

**(6) <u>Savage would benefit from Relapse Prevention Court</u>**

It is clear that the defendant has a drug abuse problem. As noted in the PSR, Savage has a history of drug abuse.

The defense is asking your Honor to impose a variance at sentencing. Savage has said that he is more than willing to participate in the Eastern District of Pennsylvania's Drug Relapse Court.[1] The program's goal is to maximize opportunities for long-term recovery from substance use and to facilitate the successful completion of the participant's term of supervised release. Participants are required to complete written presentations at the beginning and end of each phase and prepare a comprehensive relapse prevention plan prior to graduation from the program. Participants meet regularly (bi-weekly) with an RPC Judge who utilizes meaningful incentives and timely sanctions to guide behavior and promote rehabilitation.

The defense argues that this program would act as a support for Savage once he is released and could reassure your Honor that a variance would not be a risky proposition and would actually be in the benefit of Coulbourne and society.

**(7) <u>Savage would benefit from the Residential Drug Abuse Program (RDAP)</u>**

The defense would also request that the defendant be recommended for admission into the 500 hour Residential Drug Abuse Program [RDAP]. As noted above, Savage started abusing drugs at a very young age. RDAP is the Bureau's most intensive treatment program. CBT is used in a modified therapeutic community model where offenders experience living in a pro-social community. Offenders live in a unit separate from general population; they participate in half-day programming and half-day work, school, or vocational activities. RDAP is typically nine months in duration. Savage would benefit from this program.

## VII. CONCLUSION

While the PSR has comprehensively detailed the wide-ranging and often violent conduct of the entire OMERTA enterprise, the defense argues that a sufficient sentence must remain focused on the specific actions of Rakiem Savage and what actions he agreed to plead guilty to committing.

Taken together, these facts: (1) a childhood marked by a father's incarceration and a violent neighborhood, (2) the steadying presence of a grandmother and mother who never gave up on him, (3) three near-fatal shootings that would leave lasting trauma on any person, (4) demonstrated employment history, and (5) consistent, verifiable steps toward rehabilitation and treatment, all paint a picture of a young man whose history and characteristics justify a sentence meaningfully below the advisory guideline range. A sentence that accounts for who Mr. Savage is, and not merely the conduct alleged, is sufficient, but not greater than necessary, to satisfy the purposes set forth in 18 U.S.C. §

[1] https://www.paed.uscourts.gov/relapse-prevention-court

3553(a).

Respectfully submitted,



LAWRENCE J. BOZZELLI
Attorney for Rakeim Savage

Date: August 28, 2026